UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 21-MJ-668 (TNM) |
| | ) | |
| MICK CHAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MOTION TO DISMISS
COUNTS 1, 2 & 4 OF THE INFORMATION**

The defendant, Mick Chan, files this motion to dismiss these counts of the information, pursuant to Fed. R. Crim. P. 12(b). For the reasons discussed below, these counts fail to state an offense and fail to give proper notice to the defendant.

**BACKGROUND**

On September 21, 2021, Mr. Chan was arrested on a complaint charging him with violating 18 U.S.C. §1752(a)(1), (2), and 18 U.S.C. §1512(c)(2), 40 U.S.C. §5104 (e)(2)(D), and (F); and *See* ECF Dkt. Nos. 1, 5. On November 12, 2021, the government filed an information alleging the same offenses. *See* ECF Dkt. No. 9. This matter is currently scheduled for a jury trial on January 23, 2023.

The government alleges that Mr. Chan entered the Capitol grounds and Rotunda on January 6, 2021. *See* ECF No. 1.

**LEGAL AUTHORITY**

An Information must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent

1

prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)). A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Rule 12 provides that a defendant may also move to dismiss the Indictment for "failure to state an offense" and "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).

     A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997). The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

     The rule of lenity applies if the terms of the statute are ambiguous; once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992). This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id*. at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)). The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and

motivating policies of the statute." *Id*. (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)). "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words. Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole. *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

Under the foregoing legal authority counts 1, 2 & 4 of the information should be dismissed by the Court.

## ARGUMENT

### I.  Counts 1 & 2: 18 U.S.C. §1752 fails to state an offense

#### a. The United States Secret Service is the Entity that May Designate "Restricted Areas" Under the Statute, Not the United States Capitol Police

Mr. Chan is charged in counts one and two of violating 18 U.S.C. §1752 for "entering and remaining in a Restricted Building or Grounds," and engaging in "disorderly and disruptive conduct in a Restricted Building or Grounds." *See* ECF Dkt. No 9. When this statute was enacted, it is clear that the purpose was to designate the United States Secret Service ("USSS") to restrict areas for temporary visits by the President. *See* S. Rep. No. 91-1252 (1970). At the time of enactment, the USSS was part of the Treasury. Section 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. §1752(d)(1). It also allows the Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting."

3

§1752(d)(2). There is nothing in the legislative history (or the statutory language) to suggest that anyone other than the USSS has the authority to so restrict the areas surrounding the Capitol building.

    The USSS's duties and responsibilities are outlined in 18 U.S.C. §3056, which include:

> (e)(1): When directed by the President, the United States Secret Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President.
>
> (2) At the end of each fiscal year, the President through such agency or office as the President may designate, shall report to the Congress--
>
> **(A)** what events, if any, were designated special events of national significance for security purposes under paragraph (1); and
>
> **(B)** the criteria and information used in making each designation.

§3056(e)(1)(2)(A)(B). The statute does not state that any other agency is permitted to designate events for security purposes and only explains that the USSS would be under the designation of the Department of Homeland Security instead of the Treasury Department. The statute makes the exclusive role of the USSS even clearer in §3056(g), which states:

> (g) The United States Secret Service shall be maintained as a *distinct entity* within the Department of Homeland Security and shall not be merged with any other Department function. *No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service*, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department.

(emphases added).

### b. The Government Does Not Allege that the Secret Service Restricted the Capitol Grounds on January 6, 2021

The Superseding Indictment charges Mr. Chan with remaining or entering "restricted building or grounds," however it does not allege that the USSS designated that area as being restricted. Nor could it do so now because in *United States v. Griffen*, the government conceded that it was the United States Capitol Police that attempted to designate the area as restricted that day and not the USSS. 21-CR-92 (TNM) at Dkt. No. 33. The court in *Griffen* denied a motion to dismiss a §1752 charge on the ground that the statute (Congress) did not specifically state who must designate the "restricted areas." *Id*. at Dkt. No. 41.

However, the plain language of 18 U.S.C. §1752(c)(B), defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." Since it is the Secret Service who protects the President or "other person," it is the Secret Service who must designate the area "restricted." The legislative history bolsters this interpretation.[1]

The court in *Griffen* also hypothesized that the President would be unable to give an order to rely on the military fortification at Camp David already in existence when he visits that facility if the Secret Service was not the only entity with the statutory authority to restrict the area. *See Griffen* ECF Dkt. No. 41 at pg. 11. However, Camp David is a military installation and is not a "public forum" that needs an entity to "cordon off" areas and restrict them in light of a Presidential visit. Military bases have security and are not otherwise open to

---

[1] Congress enacted 18 U.S.C. §1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91- 644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971). At that time, the USSS was a part of the Treasury Department. The Senate Judiciary Committee report accompanying the current version of §1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service. S. Rep. No. 91-1252 (1970).

the public. And each military installation is subject to other laws that protect the facility, and those within it, from intruders. *See, e.g.*, 18 U.S.C §1382 (barring any person from entering any military installation for any purpose prohibited by law). Military bases are heavily guarded and have entrance and exit points and are different than federal buildings that need sections to be "cordoned" off in order for the general public to know which area is restricted. For these reasons, the example offered by the *Griffen* court is inapposite and does not support the court's decision.

Furthermore, if a deficiency in a statute creates an absurd result or creates arbitrary enforcement, it should not be enforced until it is amended to provide clarity and provide fair notice to a defendant. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The *Griffen* court's reasoning creates a different kind of absurd result –viz, anyone claiming to be a part of law enforcement could post a sign designating an area as restricted and a criminal defendant could then be penalized for trespassing because they "willfully" ignored the sign.

      **c. Even if the Capitol Police were Authorized to Restrict the Grounds, 18 U.S.C. §1752 is Not Applicable Because Former Vice President Pence Was not "Temporarily Visiting" the Capitol Building on January 6, 2021**

Under the plain language of 18 U.S.C. §1752, the statute does not apply here. Section 1752 prohibits conduct in or near "any restricted building or grounds." The statute expressly defines the term "restricted buildings or grounds" as follows:

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

    (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

6

>(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
>(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c); *see United States v. Samira Jabr*, Criminal No. 18-0105, Opinion at 12, ECF No. 31 (May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

Counts One and Two of the Superseding Indictment charge Mr. Chan with conduct "in a restricted building and grounds, that is, any posted, cordoned-off and otherwise restricted area *within the United States Capitol and its grounds, where the Vice President was temporarily visiting . . .*" See ECF No. 39, (emphasis added). The government's attempt to shoehorn Mr. Chan's conduct into the statute fails. Accordingly, those three counts should be dismissed.

The "United States Capitol and its grounds" do not automatically constitute "restricted buildings or grounds" under any prong of § 1752(c)(1). Nor did the Capitol grounds become "restricted grounds" on January 6, 2021, because of a "temporary vice-presidential visit," as the government asserts in the Superseding Indictment.

The plain meaning of "temporary" is "lasting for a time only." Black's Law Dictionary (11th Ed. 2019). "Visiting" is defined as "invited to join or attend an institution for a limited time." Merriam-Webster (2021). Together, the phrase "temporarily visiting" connotes temporary travel to a location where the person does not normally live or work on a regular basis.

> **d. The former Vice President was not "temporarily visiting" the Capitol on January 6, 2021**

The Capitol is a federal government building in the District of Columbia, where he lived and worked. Moreover, he actually worked at the Capitol Building and grounds—it was his

7

place of employment. In his official capacity as the "President of the Senate," he had a permanent office "within the United States Capitol and its grounds." The Vice President was not "visiting" the Capitol Building, he was working there, carrying out his sworn official duties to by "presiding," over the vote count ceremony. *See* 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall *meet* in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and *the President of the Senate shall be their presiding officer*.") (emphasis added).

> Past cases support this plain, common-sense reading of the statute, as they involve conduct in and near areas where the President and Vice President were clearly "temporarily visiting." *See, e.g., United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his way through a restricted area where then Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by United States Secret Service agents); *Blair v. City of Evansville, Ind*. 361 F. Supp.2d 846 (S.D. Indiana 2005) (defendant charged with 18 U.S.C.

§1752 at protest during then Vice President Richard Cheney's visit to the Centre in Evansville, Indiana). These cases all involve the President and Vice President actually traveling outside of D.C., where they live and work, and "visiting" another location for a "temporary" purpose. As a result, those cases are entirely consistent with the plain meaning of section 1752(c)(1)(B).

Here, by contrast, former Vice President Pence was not traveling to a speaking event or a political rally. He was meeting with other government officials in a federal government building where he had a permanent office as part of fulfilling his official duties as Vice President/President of the Senate. Thus, he was not "temporarily visiting" the Capitol building as required by the plain language of 18 U.S.C. §1752.

For the above reasons, Section 1752 does not apply as charged and Counts one and

two of the information should be dismissed.

**II.    Count Four**

   **a. Section 5104(e)(2)(G) is unconstitutional on its face**[2]

Mr. Chan is charged with violating 40 U.S.C. § 5104(e)(2)(G), which states that "An individual or group of individuals may not willfully and knowingly parade, demonstrate, or picket in any of the Capitol Buildings." The statute is both overbroad and unconstitutionally vague. Accordingly, this Court should dismiss Count Four of the Criminal Information (Doc. 12), which charges that Mr. Chan "willfully and knowingly paraded, picketed, and demonstrated in a Capitol Building" on or about January 6, 2021.

The First Amendment provides that "Congress shall make no law ... abridging ... the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Criminal statutes "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987). "The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *Nat'l Ass'n for*

**III.    Section 5104(e)(i)(G) is substantially overbroad.**

Section 5104(e)(2)G) flatly prohibits all parading, demonstrating, and picketing in a

---

[2] Mr. Chan does not waive any as-applied challenges, but he recognizes that they are premature at this juncture. *See United States v. Andries*, No. CR 21-93 (RC), 2022 WL 768684, at *1 (D.D.C. Mar. 14, 2022). *Advancement of Colored People v. Button*, 371 U.S. 415, 432–33 (1963).

Capitol Building. In the First Amendment context, "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (*quoting Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008)). In conducting an overbreadth analysis, a court must first construe the statute. *United States v. Williams*, 553 U.S. 285, 293 (2008). The next step is to ask whether the statute, properly construed, "criminalizes a substantial amount of protected expressive activity." *Id.* at 297; *United States v. Montgomery*, No. CR 21-46 (RDM), 2021 WL 6134591, at *23 (D.D.C. Dec. 28, 2021).

The plain language itself is strikingly broad, covering enormous swaths of protected First Amendment activity. The subsection does not limit itself to disruptive speech, protests, gatherings, or even audible oral expressions of ideas. The history of the law further shows the breadth of its prohibitions and makes clear that Mr. Chan's contentions are well-founded ones.

During a statutory revision in 1967, Representative O'Neal stated, "I am a little bit disturbed about the language . . . wherein the proposed legislation, if adopted, would make it a violation to parade, demonstrate, or picket within any of the Capitol buildings." Congressional Record-House (October 19, 1967) at 29389, *available at* https://www.govinfo.gov/content/pkg/GPO-CRECB-1967-pt22/pdf/GPO-CRECB-1967-   pt22-2-1.pdf (last accessed June 1, 2022) (hereinafter "Congressional Record").

Representative Bingham expressed concerns about overbreadth:

> I am deeply concerned about the broad scope, vague language, and possible interference with first amendment rights of the bill before us today. It was so hastily conceived and reported out of committee that no official views of the Justice Department or the District government were available. Moreover, there seems to be no disposition on the part of the bill's supporters to accept clarifying amendments.

10

Congressional Record at 29394. He also commented on the overly broad law's potential impact on peaceful, quiet visitors, describing the law as "a case of using a shotgun to eliminate a gnat." Congressional Record at 29395.

The past enforcement policy likewise shows the overbreadth of the language. *Cf. Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."). One Capitol Police regulation interpreting a previous codification of the instant statute was held unconstitutional in a case where a pastor was prohibited from quietly praying— under imminent threat of arrest—in the Capitol building. *Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 53 (D.D.C. 2000). The Capitol Police regulation explained that demonstration activity included:

> parading, picketing, speechmaking, holding vigils, sit-ins, or other expressive conduct that convey[s] a message supporting or opposing a point of view or has the intent, effect or propensity to attract a crowd of onlookers, but does not include merely wearing Tee shirts, buttons or other similar articles of apparel that convey a message.

*Id.* (quoting Traffic Regulations for the Capitol Grounds § 158). The pastor challenged that regulation, arguing it was unconstitutional, and he succeeded on his motion for summary judgment).

The *Bynum* court reasoned that, while the regulation was justified to an extent to serve the statutory purpose of preventing disruptive conduct in the Capitol Building, "it sweeps too broadly by inviting the Capitol Police to restrict behavior that is in no way disruptive, such as 'speechmaking ... or other expressive conduct'" *Bynum*, 93 F. Supp. 2d at 57 (quoting Traffic Regulations for the Capitol Grounds § 158 ). The court held that the regulation violated due

11

process, stating that:

> It does not provide either permissible or sufficient guidance under the statute it purports to implement to survive a constitutional challenge. In fact, the definition of "demonstration" in the regulation—encompassing all expressive conduct, whether disruptive or not—appears to expand the restrictive powers given by statute to the Capitol Police rather than limit or guide them. This definitional "guidepost" thus has the potential to squelch nearly any type of expressive conduct, whether or not it is actually a demonstration, and may sweep within its scope expression that is protected by the First Amendment. The regulation therefore is both unconstitutionally overbroad and unconstitutionally vague.

*Bynum*, 93 F. Supp. 2d at 58. The court focused on the regulation rather than the statute itself, operating under the premise that the statute was limited to disruptive conduct. *Id.* at 57-58.

The premise that the statute is limited to disruptive conduct, however, was and remains demonstrably false. The text does not include such a limitation, and the legislative history shows that Congress did not intend to include one. At the time of the 1967 revision, Representative Edwards expressed that he believed the "parading, picketing, or demonstrating" language violated the First Amendment because it was *not* limited to disorderly or disruptive conduct. Congressional Record at 29392. Representative Cramer stated that to add "with intent to disrupt the orderly conduct of official business" would "gut[ ] the section," eliminating any doubt as to whether the failure to include limiting language was inadvertent. *Id.* at 29394.

Perhaps unsurprisingly, the statute continues to give rise to interpretations just like the regulation at issue in *Bynum*. The United States Capitol Police Guidelines now offer the following interpretation:

> Demonstration activity is defined as any protest, rally, march, vigil, gathering, assembly or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution.[3]

---

[3] United States Capitol Police Guidelines for Conducting an Event on United States Capitol Grounds, *available at* https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/

Ironically, the current policy is even broader than the unconstitutional regulation: the former does not contain even the meager limitations that the latter did. It reads like a too-easy bar exam essay prompt with an astonishing lack of self-awareness, directly defining demonstration to include virtually all protected First Amendment activity. In *Lederman v. United States*, a district court explained the problem with a similarly broad regulation:

> For instance, assuming that the ban was applied literally and even- handedly, a group of congressional staffers or members of the general public who stood outside the Capitol arguing about the latest campaign finance bill, health care initiative, or welfare reform would presumably be risking citation or arrest for engaging in "expressive conduct that conveys a message supporting or opposing a point of view." 89 F. Supp. 2d 29, 41 (D.D.C. 2000), *on reconsideration in part*, 131 F. Supp. 2d 46 (D.D.C. 2001). The same is true here. Law enforcement policy indicates that the prohibition applies to nearly all First Amendment activity, and neither the plain language nor legislative history supports a contrary interpretation. The extraordinary breadth of the language is a feature, not a bug that can be finessed away with the right policy, regulation, or court opinion. Section 5104(e)(2)(G) is unconstitutionally overbroad.

### IV.     Section 5104(e)(2)(G) is unconstitutionally vague on its face.

The vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357–58, (1983). "Where a statute's literal scope, unaided by a narrowing [ ] [ ] interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). Thus, in the First Amendment context, a vagueness challenge can be brought even where a defendant may have been on notice that his particular conduct fell within the bounds of the statute. *See Thornhill v. State of Alabama*, 310 U.S. 88, 97-98 (1940).

---

wysiwyg_uploaded/Guidelines%20and%20Application%20for%20Conducting%20an%20Event%20on%20U.S.%20Capitol%20Grounds.pdf (last accessed June 9, 2022).

Here, the statute does not define the offense so as to put ordinary people on notice of what is prohibited, and the language encourages arbitrary and discriminatory enforcement. Ultimately, "any regulation that allows a police officer the unfettered discretion to restrict behavior merely because it 'conveys a message' or because it has a 'propensity to attract a crowd of onlookers' cannot survive a due process challenge." *Bynum*, 93 F. Supp. 2d at 58. Although the *Bynum* court placed the blame on the regulation, holding that the statute itself was constitutional, the current Capitol Police regulation is even less specific than the one in *Bynum*. That highlights how subjective the statutory language is. Evidently, guidance from a federal district court was not enough to narrow the ordinary meaning of the words in the eyes of those charged with enforcing them. It is easy to see why; "demonstrating" is an ambiguous word.

Merriam-Webster defines "demonstration" as, among other things, "an outward expression or display" or "a public display of group feelings toward a person or cause." Even using the narrower definition for the sake of argument, it remains unworkably vague for a criminal statute. Indeed, a child on a field trip remarking "We love our Capitol Police" while on a group tour of the building, or a staffer cheerfully singing "Battle Hymn of the Republic" in the atrium while walking to the office would both appear to be "demonstrating in the Capitol Building" under the dictionary definition.

It is unlikely that children on field trips or singing staffers will be arrested for parading, picketing, or demonstrating. However, "[t]he danger, of course, is that such a broadly-worded ban…would be selectively employed to silence those who expressed unpopular ideas regardless of whether the speaker created an obstruction or some other disturbance." *Lederman v. United States*, 89 F. Supp. 2d 29, 42 (D.D.C. 2000), *on reconsideration in part*, 131 F. Supp. 2d 46 (D.D.C. 2001).

The legislative history shows that discriminatory and arbitrary enforcement was anticipated and even intended by some lawmakers. The statutory scheme dealing with conduct in the Capitol Building was revised following a case where Howard University students sat on the floor in response to the Speaker's refusal to commit to taking action on their petition. *Smith v. D.C.*, 387 F.2d 233, 236 (D.C. Cir. 1967). While the D.C. Circuit Court did not address the constitutionality of the federal statute (the government had not invoked it), it did advise the legislature to clarify that area of the law generally: "in view of the confusion apparent in the enforcement of these and related statutes, we commend to executive and legislative authorities a review of this entire area of the law." *Id.* at 237.

In response, Congress acknowledged the confusion-in-enforcement concern and "revise[d] the statutes relating to improper conduct in the Capitol Buildings"; House Report 90-745 noted that recent federal appeals "decisions highlight[ed] the confusion surrounding the existing laws, their implementation and their administration."1967 U.S.C.C.A.N. 1739, 1741. Representative Jerome Waldie expressed his minority view of the law as follows:

> I suggested that the qualifying phrase used in a portion of the misdemeanor section of the act, 'with intent to disrupt the orderly conduct of official business' should have been applied to all conduct sought to be controlled. The committee did not approve of this limitation. Without such a limitation, in my view, not only does the act become of questionable constitutionality, but it becomes an instrument capable of ensnaring innocent and well-meaning visitors within its provisions.

*Id.* at 1747.

The Congressional Record provides additional insight. Representative Colmer described some additional reason for the amendment, stating that "To be perfectly frank about this bill, it is brought about because of 'the fact that there is another one of the numerous marches upon

Washington anticipated here within the next few days."[4] Congressional Record at 29388. Representative Colmer also cited the peaceful actions— sitting outside of a committee room—of the Freedom Democratic Party of Mississippi, which he described as "an extreme leftist group."[5] *Id.* He followed up that statement by contending that the bill at issue would protect the Capitol from "these misguided people who are bent on obstructing if not, in fact, destroying this, the world's most democratic form of government." *Id.* Representative Ryan noted that law seemed "defective on First Amendment grounds" and "vaguely drafted." Congressional Record at 29394.

Whatever the precise contours of the offense are, the plain statutory language "forbid[s] all demonstrative assemblages of any size, no matter how peaceful their purpose or orderly their conduct. A statute of that character is void on its face on both First and Fifth Amendment grounds." *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 587 (D.D.C.), *aff'd*, 409 U.S. 972 (1972). Here, with no clarity or specificity as to what is meant by parading, picketing, or demonstrating, the statute fails to put ordinary people on notice of what is prohibited and encourages arbitrary and discriminatory enforcement. *Cf. Thornhill v. State of Alabama*, 310 U.S. 88, 100– 01 (1940) ("The vague contours of the term 'picket' are nowhere delineated."). Accordingly, section 5104(e)(2)(G) is unconstitutionally vague on its face.

### V. Alternatively, to the extent that Section 5104(e)(2)(G) is neither substantially overbroad nor unconstitutionally vague, Count Four fails to state an offense against Mr. Chan.

Even if the statute were not overbroad or unconstitutionally vague, Count Four should

---

[4] The March on the Pentagon, a massive protest against the Vietnam War, would take place two days later.

[5] The Freedom Democratic Party of Mississippi was formed as part of Freedom Summer and was supported by Dr. Martin Luther King. *See* "Mississippi Freedom Democratic Party (MFDP)," *King Encyclopedia*; Stanford University Martin Luther King, Jr. Research and Education Institute.

still be dismissed. The Information fails to state an offense as to Count Four. In evaluating whether charging documents fail to state an offense, "[t]he operative question is whether the allegations in the indictment, if proven, permit a jury to conclude that the defendant committed the criminal offense as charged." *United States v. Akinyoyenu*, 199 F. Supp. 3d 106, 109 (D.D.C. 2016). Thus, charging documents "must do more than simply repeat the language of the criminal statute." *Russell v. United States*, 369 U.S. 749, 764 (1962). "To satisfy the protections that the Sixth Amendment guarantees, '*facts* are to be stated, not conclusions of law alone.'" *United States v. Miller*, No. 1:21-CR-00119 (CJN), 2022 WL 1718984, at *3 (D.D.C. May 27, 2022) (quoting *United States v. Cruikshank*, 92 U.S. 542, 558 (1875)).

Additional interpretative rules apply when a criminal defendant challenges the statute's scope and its application to his alleged conduct. *United States v. Miller*, No. 1:21-CR-00119 (CJN), 2022 WL 823070, at *4 (D.D.C. Mar. 7, 2022), *reconsideration denied*, No. 1:21-CR-00119 (CJN), 2022 WL 1718984 (D.D.C. May 27, 2022). The first is the "prudent rule of construction": courts should exercise restraint in assessing the statute's reach to ensure fair warning and give deference to legislative intent. *Dowling v. United States*, 473 U.S. 207, 214 (1985). The second is the rule of lenity, which requires courts to resolve statutory ambiguities in favor of criminal defendants. *Liparota v. United States*, 471 U.S. 419, 427 (1985).

Here, the charging document allegations are insufficient to prove Count Four even if taken as true. There are numerous possible readings of the statute, but all plausible readings of "picketing" and "demonstrating" require some form of verbal or symbolic expression of a feeling, belief, or idea. All plausible readings of parading, going with its Merriam-Webster definition and ordinary meaning, would require some sort of marching or participation in a processional. And, even if they did not, the rule of lenity would require any ambiguity to be resolved in Mr. Chan's

17

favor.

While the Information accuses Mr. Chan of being "in a Capitol Building" on January 6, 2021, there are no specifics as to the facts and circumstances of any parading, picketing, or demonstrating. The charging documents do not allege Mr. Chan engaged in any form of speech or expressive conduct in the Capitol Building. The bare recitation of the statutory language is not enough. Accordingly, Count Four fails to state an offense against Mr. Chan and must be dismissed.

## **CONCLUSION**

For all of reasons discussed above, the Court should (i) dismiss counts 1, 2 and 4 of the Information; and (ii) grant Mr. Chan such other and further relief as the Court deems just and proper.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

*s/Peter M. Carter*
Peter M. Carter
Assistant Federal Public Defender
District of New Jersey
1002 Broad Street
Newark, NJ 07102
973-693-4995