# FEDERAL PUBLIC DEFENDER
### DISTRICT OF NEW JERSEY
K. ANTHONY THOMAS, FEDERAL PUBLIC DEFENDER

1002 BROAD STREET • NEWARK, NEW JERSEY 07102 • (973) 645-6347



April 27, 2023

**Via ECF and Email**

Honorable Trevor N. McFadden
United States District Judge
District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Ave. NW, Washington, DC 20001
Washington, DC 20001

      Re: United States v. Mick Chan
      (21-cr-0668)

Dear Judge McFadden:

      Mr. Chan is an American immigrant with no prior criminal history. His story is a microcosm of the American story – one of adversity, alienation, and finally of assimilation and community. Mr. Chan now understands that his conduct on January 6 was unlawful. But his conduct came from a place of misguided love for his country, and faith in the community of Trump supporters that constituted his new family.

      Mr. Chan voluntarily submitted to multiple interviews with the FBI, where he openly and frankly admitted to his conduct. While on pre-trial release, no issues have arisen, and Mr. Chan has been completely compliant during supervision. Based on Mr. Chan's limited role in the offense, his background and history, his current employment, and his compliance on supervision, Mr. Chan respectfully asks the Court for a sentence of probation without home detention.

    **I.**    **Legal Standard**

      Punishment must "suit not merely the offense but the individual defendant." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)). "There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her as an individual." *Concepcion v. United States*, 142 S. Ct. 2389, 2395 (2022). "When a defendant appears for sentencing, the sentencing court considers the defendant on that day, not on the date of his offense or the date of his conviction." *Id.* at 2396.

      In this District, the Court's sentencing determination involves a two-step process. "A district court begins by calculating the appropriate Guidelines range, which it treats as 'the starting point and the initial benchmark' for sentencing." *United States v. Akhigbe*, 642 F.3d 1078, 1084

(D.C. Cir. 2011) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). "Then, 'after giving both parties an opportunity to argue for whatever sentence they deem appropriate,' the Court considers all of the section 3553(a) sentencing factors and undertakes 'an individualized assessment based on the facts presented.'" *Id.* (quoting *Gall*, 552 U.S. at 49-50). The ultimate sentence is an exercise of the Court's discretion. *Freeman v. United States*, 564 U.S. 522, 529 (2011).

"Congress has instructed sentencing courts to impose sentences that are sufficient, *but not greater than necessary*, to comply with (among other things) certain basic objectives, including the need for just punishment, deterrence, protection of the public, and rehabilitation." *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 765–66 (2020) (emphasis in original). In determining what sentence is sufficient, courts must consider:

(1) the nature and circumstances of the offense;
(2) the history and characteristics of the defendant;
(3) the kinds of sentences available;
(4) the advisory range given in the U.S. Sentencing Guidelines;
(5) any pertinent policy statements from the U.S. Sentencing Commission;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records convicted of similar conduct; and
(7) the need to provide restitution to any victims.

18 U.S.C. § 3553(a).

"Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam). "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id.* (emphases in original). Indeed, "*even in a mine-run case*" where "a particular defendant . . . presents no special mitigating circumstances—no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post-offense rehabilitation—a sentencing court may nonetheless vary downward from the advisory guideline range" if it concludes that the range is "at odds with § 3553(a)." *Spears v. United States*, 555 U.S. 261, 263 (2009) (emphasis in original); *see also Kimbrough v. United States*, 552 U.S. 85, 110 (2007).

## II. Guidelines Calculations

The U.S. Probation Office calculated Mr. Chan's total offense level at 10 in its PSR, putting him in Zone B, allowing for a sentence of probation. Because Mr. Chan was significantly less culpable than the average participant, he should receive a minor participant reduction pursuant to USSG §3B1.2(b).[1] Mick Chan cut a piece of tarp, moved two barricades, and entered and peacefully walked around the Capitol. Mr. Chan did not participate in numerous prohibited activities which other Capitol rioters did participate in, and did not engage in any violent acts.[2]

---

[1] The defense filed this objection to the draft PSR.

[2] Conduct Mick Chan never participated in include but is not limited to:

2

Therefore, his offense level should be 8, with a Guidelines range of 0-6 months. If the Court is reluctant to grant a departure, the 3553(a) factors render it appropriate to vary downwards to a probationary sentence.

### III. The 3553(a) factors

*a. Mick Chan's History and Characteristics*

Due to Mr. Chan's complete lack of criminal history, the gravity and anomaly of these criminal charges on his life, and his complex family background and history, we have attached for the court's review a detailed psychosocial history and assessment of Mr. Chan. *See* Ex. 1 ("Mitigation Report"). The assessment is the product of numerous interviews of Mr. Chan and his family members conducted by a licensed master social worker. What follows below is also the

- Physically tear down any bike racks
- Ram any officers with bike racks
- Physically tear down any snow fencing
- Physically tear down or alter any signs saying "Area closed"
- Assault police officers
- Use flag poles to assault officers
- Use pepper spray to spray at any officers
- Yell at any police officers
- Carry any guns
- Carry around a bullhorn
- Have a gas mask
- Have a bullet proof vest
- Have tactical gear
- Break down any windows
- Break down any doors
- See any broken glass at the doors of the Capitol
- Have any officers tell him not to go into the Capitol
- Hear any alarms blaring as he entered the Capitol
- Yell or scream inside or outside the Capitol
- Bring a flag into the Capitol
- Announce "this is war"
- Climb on top of any statues
- Run to the House Chamber where Congress was sitting after getting into the Capitol
- Run to the Senate Chamber where the Senate was sitting after getting into the Capitol
- Intend to try to stop the peaceful transfer of power
- Intend to disrupt the certification of the election
- Intend to harm the VP
- Intend to harm any member of the Senate
- Intend to harm any Congressman

3

product of numerous interviews of Mr. Chan and his family members conducted by the Federal Public Defender's Office for the District of New Jersey.

Although Mr. Chan was the product of a two-parent household, both his mother and father were absent for various reasons. Mr. Chan spent the early parts of his childhood in Hong Kong, without family or community. His father was largely absent from his life, choosing to spend most of his time traveling to the United States on business. His mother suffered from depression and other mental health issues that left her hospitalized for significant periods of time, and unable to properly care for her children. In the mid-1980s, Mr. Chan's father moved permanently to the United States, and his wife and other children soon followed him. Due to visa issues, Mr. Chan was left alone in Hong Kong, where he lived under the custody of family friends. His caretakers viewed him as an obligation and Mr. Chan found himself isolated and alone, spending much of his time in transactional relationships with adult strangers. His caretakers' own children were significantly older than Mr. Chan and he was not able to bond with them. Instead, he spent his time engaging in child labor: making jewelry for the profit of his caretakers. Mr. Chan's memories of Hong Kong are now limited and mundane, consisting of events such as learning to take the bus on his own as a child. It was not until 1990 that Mr. Chan joined the rest of his family in the United States at the age of ten.

Once in the United States, Mr. Chan faced new challenges. He discovered upon arrival in the United States that in his absence, his mother had committed suicide, having jumped off an apartment building in New York City. Not only did no one inform him of her death while he was in Hong Kong, no one informed him of her death upon his arrival in the United States, until a planned visit to "see" his mother in a mausoleum. Only then did Mr. Chan realize that she was gone from his life forever, and he now describes her loss as the single worst thing that has ever happened to him. His mother's death hurt all her children, but it hit Mr. Chan especially hard, as he was her favorite child. His father quickly remarried a woman who spoke only Mandarin. Mr. Chan, who spoke Cantonese and English, was left unable to communicate with the only maternal figure remaining in his life. His father remained distant, speaking rarely about his mother's death, providing little emotional support to his children, and spending no quality time with them. Mr. Chan's father instead focused most of his time and energy on his burgeoning import export business. Although his father provided Mr. Chan with financial support in childhood, a gambling problem ultimately devasted his finances which forced Mr. Chan to drop out of college. Facing tuition of $20,000 a year, half of which was covered by scholarships, Mr. Chan left his studies after one of his father's checks bounced.

In high school, Mr. Chan spent most of his time with a now ex-girlfriend, and their breakup and estrangement left him without social connections to his adolescence. Without family support and community, and without the social circles offered to individuals who attend and complete college, Mr. Chan turned to what so many individuals these days do: the Internet. On the Internet, he finally found a salve for his isolation: he found his tribe. On the Internet, Mr. Chan found individuals who, unlike his family, he freely communicated with. He found individuals who shared his frustrations at the COVID lockdowns occurring during the pandemic. Although not previously political, Mr. Chan found himself agreeing with and identifying with conservative viewpoints espoused on online platforms such as Facebook. Through these platforms, he connected with and found community in like-minded individuals. He started posting his opinions and receiving the

4

kind of positive feedback he rarely received from his family. He developed the types of strong bonds most individuals form at a young age with family members, but which he never had in the past. His online community of Trump supporters meant the world to him. He now reports that most of his friends are people he met online, and that he does not have close friends outside of his political community.

It was due to these relationships that Mr. Chan went to the Capitol on January 6. He went not intending to break the law, commit any crimes, or impede the conduct of government or the police. On the contrary, Mr. Chan has great respect for law enforcement. In the aftermath of 9/11, he volunteered for and engaged in fundraising on behalf of police departments in Brooklyn. Mr. Chan went to the Capitol not to obstruct law enforcement, but to support and socialize with the people who were more like family to him than his biological family. He went without any harmful intent; his conduct was meant to express solidarity with other Trump supporters; and at any moment all his choices were consistent with following the crowd. He understands now that his conduct was unlawful, but it came from his love for his country, even if the way he expressed that love was misguided, and his affinity for the broader political community he discovered online.

Mr. Chan is a productive member of society. He has had a long career in the food industry including prior employment in high end cuisine such as at the Michelin rated Eleven Madison Park, and the famous Morimoto. Although the pandemic interrupted his career due to his unwillingness to comply with vaccine mandates (he most likely would have found employment at the renowned restaurant Alinea otherwise), Mr. Chan is ready to move forward with his career. He has found employment with Wild Thyme Gourmet in Highlands, North Carolina, where he hopes to pick up his career. Mr. Chan is an intelligent person, with potential to contribute much to society. Though he never graduated from college, his academic accomplishments include scoring a perfect score on the SAT Math. Mr. Chan is also a man of integrity and reports that his favorite author and book is Jim Rohn's *Seasons of Life*, because it emphasizes the importance of knowing what one's principles are and making sure one's compass is pointed to principles. The Court saw Mr. Chan's integrity and principles first-hand in his truthful and frank testimony at trial. Mr. Chan will suffer for his misconduct on January 6, an entirely anomalous incident in his life. For an individual who has no prior criminal history and no violent bone in his body, he will have to report to employers that he has a federal criminal conviction. This is punishment enough. As he put it himself, he simply got "swept up" in the moment, and in the future knows to stay away from such situations.

Mick Chan is a man of great incongruity. He is capable of being a high achiever, yet also faces a federal criminal conviction. Mick Chan requires significant therapy to untangle the trauma that resulted from his abandonment in childhood. Although Mr. Chan has not voluntarily sought out professional help in his past, noting in an interview that he "deals with difficult things on his own," he also expressed that he "wouldn't hesitate to seek a professional opinion," and is likely amenable to therapy. In the seminal work, *The Boy Who Was Raised As a Dog And Other Stories From A Child Psychiatrist's Notebook* by Dr. Bruce D. Perry, M.D., Ph.D., Dr. Perry[3] explains that neglect, lack of affection, and even lack of touch during childhood can have severe

---

[3] Dr. Perry serves as adjunct professor at Northwestern's Feinberg School of Medicine, https://www.feinberg.northwestern.edu/faculty-profiles/az/profile.html?xid=18411

5

repercussions on a person as they grow. For instance, studies have shown that children who face neglect show deficits in socio-emotional behaviors and experience more psychiatric disorders. Children who face neglect also struggle more with executive functions, such as cognitive flexibility, inhibitory control, and working memory. Dr. Perry recommends that individuals who have suffered from childhood neglect engage in treatment with a licensed healthcare practitioner. Mr. Chan has never benefitted from any such structured therapy.

Further, the actions of those who rioted at and entered the Capitol cannot be divorced from trauma. According to Dr. Ruth Lanius, psychiatrist, professor and director of the post-traumatic stress disorder research unit at Western University in London, Ontario, "the horrific behavior of the rioters . . . is often rooted in trauma." Dr. Lanius explained that "[t]he way we grow up and what we experienced throughout life really shapes us." Those, like Mick Chan, who "grow up … without knowing what trusting in another is, what really knowing what feeling safe is like, we're going to grow up with a very different sense of self in this world." For someone like Mick Chan grew up "without this secure base, traumatic experiences accumulate and cause problems."[4]

### b. *Nature and circumstances of the offense*

Mick Chan went to the Capitol on Jan 6. He cut a piece of tarp. He moved two barricades. He went inside the Capitol. Inside the Capitol, he peacefully walked around and took pictures. He left the Capitol within thirty minutes of entering. Mr. Chan did not engage in any violent conduct while he was in the Capitol. And he was not motivated by a desire to undermine democracy. To the contrary, his actions stem from a misguided love of this country.

### c. *A non-custodial term of supervised release is sufficient to satisfy the purposes of punishment*

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.

Quote from the Honorable Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

Sentencing Mr. Chan to a term of supervised release satisfies the punitive purposes of punishment. For a previously fully law-abiding citizen like Mr. Chan with no prior criminal history, a criminal conviction itself is enormously punitive. Such a conviction can result in various

---

[4] Joanna Cheek, *To understand the Capitol insurrection, we need to understand trauma*, Toronto Star (Mar. 14, 2021), https://www.thestar.com/news/insight/2021/03/14/to-understand-the-capitol-insurrection-we-need-to-understand-trauma.html

sanctions and disqualifications that can last indefinitely.[5] In addition, Mr. Chan will for the rest of his life have to report to potential employers that he has a record of a federal criminal conviction.

While many believe that the higher the sentence, the greater the effect in deterring others, empirical research shows no relationship between sentence length and deterrence.  A May 2016 report published by the National Institute of Justice (the "NIJ"), a division of the Department of Justice, found that "increasing the severity of punishment does little to deter crime."[6] The NIJ report focused on "Five Things About Deterrence" based on an extensive body of research on the impact of sentencing on deterring future crimes. The report found that there is no data to support the notion that longer prison sentences are more effective at preventing future crime. The data shows that it is the certainty of being caught rather than the fear of punishment that creates a deterrent effect. Based on this evidence, the NIJ concluded that the "crime prevention benefit [of prison] falls short of the social and economic costs."

In contrast, there is evidence demonstrating that prison may *heighten* the risk of recidivism. *See e.g.*, THE SENTENCING PROJECT, INCARCERATION AND CRIME: A COMPLEX RELATIONSHIP 7 (2005) ("The rapid growth of incarceration has had profoundly disruptive effects that radiate into other spheres of society. The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to fray family and community bonds, and contribute to an increase in recidivism and future criminality.") (footnote and citation omitted). Thus, rather than *serving* the purpose of protecting the public, unnecessary incarceration *undermines* that goal.

Pursuing therapy would be much more likely to protect the public and prevent recidivism than incarceration. Indeed, 18 U.S.C. § 3553(a)(2)(D) directs that courts should consider, in determining a particular sentence, the need for that sentence to provide a defendant with medical care "in the most effective manner." Under these circumstances, a probationary sentence with mandated mental health treatment is sufficiently punitive, affords adequate deterrence and protects the public.  Any prison time is unnecessary and is ultimately costly to the citizens of this country.

> d. *A non-custodial term of supervised release would not create unwarranted sentencing disparities*

A review of prior district court sentences shows a significant number of non-custodial sentences for violations of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), and 40 U.S.C. § 5104(e)(2)(G). *See* Ex. 2. ("Collected cases") While the majority of non-custodial sentences were for violations of 40 U.S.C. § 5104(e)(2)(G), several were for violations of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), and in at least three instances (highlighted in green in Exhibit 2),

---

[5] Beyond the Sentence – Understanding Collateral Consequences, National Institute of Justice, Department of Justice (Nov. 2017), https://www.nij.gov/journals/272/Pages/collateral-consequences.aspx

[6] *Five Things About Deterrence*, The National Institute of Justice, U.S. Department of Justice (June 6, 2016), http://nij.gov/five-things/pages/deterrence.aspx

7

individuals who were convicted of all three above charges were sentenced to non-custodial terms. *Id.* Sixteen of the collected cases were cases decided by the current Court (highlighted in yellow in Exhibit 2). *Id.*

1. Notably, Nicholas Rodean was found guilty before your honor of violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), and 40 U.S.C. § 5104(e)(2)(G), along with 18 U.S.C. § 1361 (destruction of government property), 18 U.S.C. § 1752(a)(4) (engaging in physical violence in a restricted building or grounds), 40 U.S.C. § 5104(e)2)(D), and 40 U.S.C. § 5014(e)(2)(F) (act of physical violence in a Capitol grounds or buildings). ECF No. 75 (Rodean Judgment). He behaved in ways that made him significantly more culpable than Mr. Chan—specifically he pursued an officer into the Capitol building and up to the Senate chamber, he broke two Capitol windows, he took a hatchet into the Capitol, and he still received a non-custodial sentence. ECF No. 77 (Rodean Sentencing Transcript) at 9, 47, 48. The Court found that the defendant's mental health condition, specifically Asperger's, significantly mitigated the blameworthiness of his conduct. *Id* at 49. The Court took note that the defendant's actions on January 6 were a complete aberration, as well as the defendant's pre-trial compliance. *Id.* The Court found that all these factors justified a non-custodial sentence. *Id.* at 50. Mr. Chan similarly suffers from untreated mental health challenges stemming from the neglect and abandonment he faced in childhood, which significantly mitigates the blameworthiness of his conduct; his actions on January 6 were also a complete aberration and he has been compliant pre-trial. He should similarly receive a non-custodial sentence.

2. In Matthew Council, also before this Court, the defendant was found guilty of violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), and 40 U.S.C. § 5104(e)(2)(G), along with 18 U.S.C. § 231(a)(3) (civil disorder), 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers), and 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in a Capitol building). ECF No. 75 (Council Judgement). Mr. Council yelled at and taunted police officers, and charged a line of officers, knocking one to the ground – conduct much more serious than Mr. Chan's. *Id.* at 100. Mr. Council suffered from depression, bipolar disorder, and was likely going through a manic episode on Jan 6. *Id.* at 10, 42, 102. The Court found that Mr. Council's mental health challenges made him susceptible to acting the way he did, mitigating his blameworthiness. *Id.* at 102, 103. While Mr. Chan's mental health challenges are less acute, what he shares with Mr. Council is a common increase in susceptibility and a common effect of mitigating blameworthiness stemming from his trauma. Similarly to Mr. Rodean and Mr. Chan, the Court also found that Mr. Council's January 6 conduct was an aberration. *Id.* at 104. The Court sentenced Mr. Council to a non-custodial sentence.

3. In Matthew Wood, Judge Mehta sentenced a January 6 defendant to a non-custodial sentence, despite being adjudicated guilty of the following offenses: 18 U.S.C. §§ 1512(c)(2) and 2 (obstruction of an official proceeding and aiding and abetting), 18 U.S.C. § 1752(a)(1) (entering and remaining in a restricted building or grounds), 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds), 40 U.S.C. § 5104(e)(2)(C) (entering and remaining in certain rooms in the Capitol building), 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in a Capitol building), and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol building). ECF No. 65

(Wood Judgment). Notably, Judge Wood decided to impose a non-custodial sentence even though Mr. Wood entered the Speaker's office, which Mr. Chan never did. Judge Wood noted that "it's one thing to walk around the Rotunda . . . it's quite another thing when you enter somebody's private offices." ECF No. 64 (Wood Sentencing Transcript) at 64. Nevertheless, Judge Mehta chose a non-custodial sentence, even without the existence of mitigating mental health or other such circumstances, in light of the history and characteristics of the defendant. Specifically, like Mr. Chan, Mr. Wood had no prior criminal history. *Id.* at 63. Judge Mehta remarked that "people were lied to. People were influenced in ways that people who were doing the influencing should have known better. And it's people like Mr. Wood who are then left to suffer the consequences." *Id*. at 64.

## IV. Conclusion

For the reasons set forth above, Mr. Chan submits that a sentence of probation without home detention and no fine is appropriate in this case. Mr. Chan's actual conduct is less serious than many other rioters and is a result of his untreated mental health challenges. Therefore, for all the reasons set forth above, he respectfully asks that the Court impose a probationary sentence that will allow him to undergo mental health treatment.

Respectfully submitted,

*s/ Shishene Jing*

Shishene Jing
Assistant Federal Public Defender
District of New Jersey

cc:   Katherine Boyles, Assistant U.S. Attorney (e-mail)
      Matthew Moeder, Assistant U.S. Attorney (e-mail)
      Aidee Gavito, U.S. Probation Officer (e-mail)