### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-668 (TNM)** |
| **v.** | : | |
| | : | |
| **MICK CHAN,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Mick Chan to 10 months of incarceration, one year of supervised release, 60 hours of community service, and $500 of restitution.

### I.   Introduction

Defendant Mick Chan, a 42-year-old food services worker, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Following a bench trial, this Court found Chan guilty of three of four charged counts of the Information:[2]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] The Court acquitted Chan of Count 3, Disorderly Conduct on Capitol Grounds with the Intent to Impede the Orderly Conduct of a Session of Congress, 40 U.S.C. § 5104(e)(2)(D).

- Count 1, Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);

- Count 2, Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); and

- Count 4, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

As explained herein, a significant sentence of incarceration is appropriate in this case because Chan: (1) facilitated the breach of the northwest staircase by destroying government property, namely, tarping covering the inaugural stage; (2) endangered the safety of police by aiding other rioters in lifting bike racks and a makeshift battering ram onto the northwest staircase; (3) had to be expelled from the Capitol Building by police because he would not leave of his own accord; and (4) has not accepted responsibility for his actions, and maintained at trial that he thought January 6 was "an inside job" and that police use of non-lethal munitions against him and the crowd was "unjustified."

The Court must also consider that Chan's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Without the aggregated efforts of rioters like Chan, the riot likely would have failed. As a U.S. Capitol Police ("USCP") captain testified at trial, that despite working at many prior rallies (including prior MAGA rallies and the George Floyd protests), he had "never seen anything like this before." Trial Tr. 56. Here, the facts and circumstances of Chan's actions in facilitating the disorder on January 6, and his lack of remorse for his conduct, support a sentence of 10 months imprisonment.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1-1 (Statement of Offense), at 1-7.

*Defendant Chan's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Chan travelled from Edison, New Jersey to Washington, D.C. by car with three companions.[3] Trial Tr. 126 (Chan Testimony). They intended to attend former President Trump's "Stop the Steal" rally, but after checking in to their hotel in Arlington, Virginia, they arrived in D.C. too late to hear most of the former President's speech. Trial Tr. 128. As they exited the Metro and joined the rallying crowds, Chan learned that a large crowd was heading towards the Capitol. Trial Tr. 129. Wearing safety goggles around his neck, Chan joined this crowd, walking along the National Mall towards the west front of the Capitol. *See* Trial Tr. 130. Eventually, he made his way onto Capitol grounds and onto the northwest staircase.

Chan was one of the first rioters to climb atop the northwest staircase banister. While there, Chan worked with other rioters to lift bike racks off the ground and onto the banister. *See* Image 1 (Tr. Ex. 301c), Image 2 (Tr. Ex. 301d), Image 3 (Tr. Ex. 301e). Chan also assisted other rioters in lifting a long, brown pole, up and over the northwest banister. *See* Image 4 (Trial Ex. 304b). In its verdict, the Court remarked that there was "no doubt that the bike rack was intended to be used as a weapon against the officers and the pole was intended to be used as a battering ram." Verdict Tr. 7.

---

[3] To date, the government is not aware that these companions entered the Capitol building.



*Image 1*



*Image 2*



*Image 3*



*Image 4*

Chan also used a hunting knife to cut away portions of white tarp that was part of the construction of the inaugural stage on the west front of the Capitol. *See* Image 5 (Trial Ex. 303d), Image 6 (Trial Ex. 302e). The USCP captain testified at trial that the cutting away of the white tarp "became a safety concern." Trial Tr. 46. "The tarp was preventing individuals from actually entering the scaffolding area. As soon as the tarp was removed, it gave the protesters the ability to walk from the landing inside – to inside the scaffolding or from the scaffolding outside to the landing area." *Id.* In other words, Chan's activities in cutting away the tarp enabled many other protesters to infiltrate what had previously been a closed off space. *See* Image 7 (Def. Trial Ex. L).





*Image 5*                                    *Image 6*







| *Image 7* | *Images 8 & 9* |

Ultimately, police deployed non-lethal crowd control measures against members of the crowd on the northwest stairs, and a pepper ball (alternatively described by Chan as a paintball) hit Chan in the face. Trial Tr. 139; *see also* Image 8 (Trial Ex. 307a), Image 9 (Def. Trial Ex. O) (Chan's photograph of a pepper ball). Nevertheless, Chan was undeterred, and remained at the northwest staircase.

The USCP captain further testified that at approximately 2:09 p.m. on January 6, protesters overwhelmed the police officers that were stationed at the northwest stairs to prevent entry to the Upper West Terrace of the Capitol. Trial Tr. 55-56. At 2:14 p.m., Chan ascended the stairs and assisted other rioters in climbing up and over the northwest stair banister. Trial Tr. 58; *see also* Image 10 (Trial Ex. 201a).



*Image 10*

By 2:45 p.m., Chan had made his way inside of the U.S. Capitol building by way of the Upper West Terrace door. Upon entry, he displayed his middle finger to the CCTV and took a picture of himself doing so. *See* Image 11 (Trial Ex. 202b), Image 12 (Def. Trial Ex. II). Chan testified that he did so "for posterity, for my own documents," because by then, he had "already made up [his] mind that something I characterized as fishy happened and it was some level of inside job. *And so this is for the people behind that orchestration*." Trial Tr. 163 (emphasis added).

 

*Image 11*                    *Image 12*

Chan then spent roughly half an hour inside the Capitol building. He had several opportunities to leave the building and appeared on CCTV cameras near the east front door

multiple times. *See* Trial Tr. 68-81. Yet instead of taking any opportunity to exit the building, Chan did not leave the building until he was forced out by police at approximately 3:14 p.m.

Even after being forced out of the Capitol building, Chan testified that he remained on Capitol grounds for three to four hours longer, until close to the mayor's curfew that went into effect at 6:00 p.m. Trial Tr. 207.

### Chan's Post-January 6 Contact with FBI, Interview, and Trial Testimony

On January 8, 2021, Chan contacted his cousin to ask for the contact information of an FBI agent that Chan's cousin knew.[4] *See* Trial Tr. 171-72. Chan testified that he wanted to "relay to him my observation of the event and what I felt was some shady operation that had happened." *Id.* This Court observed that these were "the actions of someone who is trying to ingratiate himself with authorities in order to deflect liability from himself." Verdict Tr. 16.

Chan later provided a *Mirandized* interview to another FBI agent. During that interview, Chan reported that he thought that the police retreat from the northwest stairs was "fishy as hell" and that "it was off that people just broke in so easily." Trial Ex. 500T (Interview Tr.), 51. He told agents that he had expected Black Lives Matter (BLM) or Antifa counter-protesters on January 6. *Id.* at 57-58.

Several themes emerge from Chan's testimony at trial. First, he downplayed his own involvement in the events of January 6 and the involvement of rioters around him. For instance, he testified that he had used another protester's hunting knife to cut the inaugural stage tarp to "take cover." Trial. Tr. 153. He said he cut the tarp, "[m]ainly for safety, just taking cover" after he had been hit with a pepper ball. Trial Tr. 154. Video evidence at trial, however, showed him

---

[4] By the time Chan made contact with the FBI, the FBI had already received his name as a January 6 suspect through a tip. *See* Trial Tr. 259-60.

tearing off the tarp and discarding it over the ledge, not hiding under it. *See* Images 6 and 7, *supra*. Moreover, Chan told the FBI that he had taken the tarp down because he was "mad" that officers had shot non-lethal munitions at him. Trial Tr. 193. Chan further testified that he had moved some of the bike racks because he thought they were "damaged." Trial Tr. 195. He also testified that he did not recall whether there was an alarm sounding when he entered the building through the Upper West Terrace door, though alarms could clearly be heard. Trial Tr. 201. And although prior testimony established that he was a mere 20 feet from police on the northwest stairs, he testified that he did not recall witnessing any struggling between police and other rioters. Though the Court found Chan a credible witness "in general," the Court also found that "[t]here were points in his testimony and in his interview with the FBI in which … he was evasive and less than candid in his answers." Verdict Tr. 4.

Second, Chan again highlighted his suspicions that January 6 was "an inside job." Trial Tr. 163. He testified that seeing police officers "appearing out of nowhere" to secure the stairs to the Rotunda "raised even more suspicions that this [was] some kind of an entrapment. It totally smelled like a preplanned operation going on." Trial Tr. 170-71, 202. He was also suspicious that there were infiltrators in the crowd, belonging to either BLM or Antifa. Trial Tr. 139. He further testified that "the flash bangs you could hear going off in the background probably aroused a little initial suspicion." Trial Tr. 144.

Third, Chan suggested that his distrust of the media provided a justification for his actions: "I think in general they make purposeful lies to support whatever political parties they lean towards. They are not neutral." Trial Tr. 159-60. He claimed that he entered the building "Just to offer a perspective that I know would ultimately differ from what the mainstream media would try to portray and to document who I think would be possible infiltrators." Trial. Tr. 174.

Finally, Chan testified that he thought police had used excessive force against him while deploying non-lethal crowd control measures: "At the time, I felt that [being shot like that] was unjustified. *Even now*." Trial Tr. 139 (emphasis added).

### III.   Statutory Penalties

Chan now faces sentencing on three of four counts of the Criminal Information: Count 1, Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count 2, Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); and Count 4, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). As noted by the U.S. Probation Office, Chan faces maximum penalties of up to one year of imprisonment and a fine of up to $100,000 on Counts 1 and 2.

### IV.   The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | 0 |

Total Adjusted Offense Level                                                     10

*See* PSR at ¶¶ 27-33. The Probation Office calculated Chan's criminal history as a category I. PSR

¶ 44. Accordingly, the Probation Office calculated Chan's total adjusted offense level and his

corresponding Guidelines imprisonment range (after offense grouping) as 6-12 months. PSR ¶ 82.

Here, while the Court must consider the sentencing factors under 18 U.S.C. § 3553 to fashion a

just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.

### *Chan's Objection to the Guidelines Calculation*

Chan objects to the Probation Office's calculation of his Guidelines range; he argues that

he is entitled to a two-level reduction as a "minor participant" pursuant to U.S.S.G. § 3B1.2(b).

The minor-participant adjustment applies to defendants who are "substantially less

culpable than the average participant in the criminal activity," *id.*, app. n.3(A), but "whose role

could not be described as minimal," *id.*, app. n.5. A "participant" is a "person who is criminally

responsible for the commission of the offense, but need not have been convicted."  See *id.*, app.

n.1*; see also* U.S.S.G. §3B1.1, app. n.1.  Accordingly, a defendant may receive the minor-role

adjustment if their criminal activity involved at least one other "participant."  As the commentary

to § 3B1.2 expressly states: "an adjustment under this guideline may not apply to a defendant who

is the only defendant convicted of an offense unless that offense involved other participants in

addition to the defendant . . . . "  U.S.S.G. §3B1.2, app. n.2.

In 2015, the Sentencing Commission amended the application notes for U.S.S.G. §3B1.2

to specify that, when determining mitigating role, the defendant is to be compared with the other

participants "in the criminal activity." U.S.S.G. App. C, amend. 794 (effective Nov. 1, 2015).

Thus, the relative culpability of the "average participant" is measured only in comparison to those

persons who actually participated in the criminal activity, rather than against "typical" offenders

who commit similar crimes. U.S.S.G. §3B1.2, app. n.3(A); *see also United States v. Arias-Mercedes*, 901 F.3d 1, 6 (1st Cir. 2018) ("[Amendment 794] simply eliminated the need to compare a defendant's conduct with the conduct of hypothetical participants in similar offenses . . . . It does not require courts, when weighing mitigating role adjustments, to appraise a defendant's role in the broader conspiracy as opposed to his role in the specific criminal activity for which he is being held accountable.") Moreover, the defendant bears the burden of proving by a preponderance of the evidence that he or she is entitled to a mitigating role adjustment. See *United States v. Nkome*, 987 F.3d 1262, 1269 (10th Cir. 2021).

In another January 6 case, *United States v. Hodgkins,* 21-cr-0188, Judge Moss considered the applicability of § 3B1.2 and concluded that the needed comparison is only with defendant's co-conspirators. "When the sentencing commission amended the guidelines in 2015, it made clear that the Court must consider the defendant's culpability only by reference to his or her co conspirators in the case at hand. I'm not supposed to look at the universe of persons participating in similar crimes." *United States v. Hodgkins,* 21-cr-0188, July 19, 2021 Sent. Tr. at 9. And even if a January 6 defendant were compared to other rioters who committed more egregious conduct, a defendant is not necessarily entitled to a § 3B1.2 reduction: "The fact that others may face significant enhancements for engaging in threatening, violent or destructive behavior doesn't mean that [a particular defendant's] role and the offense to which he has pleaded guilty was minor." *Id.* at 10.

Chan has not met his burden to show that the minor-role adjustment should apply in his case, nor could he, based on the facts established at trial. In his objection to the PSR and in his sentencing memorandum, he enumerates specific actions that he did not do that other rioters did do on January 6. *See* Def. Sent. Memo, Doc. 55, at 2, n.2. This is not the analysis required for

§ 3B1.2. Instead, the adjustment requires an assessment of Chan's relative role in the offense and criminal conduct that he committed, which requires a comparison of Chan's conduct to that of other persons who committed the same offense, *i.e.*, his co-conspirators or other codefendants, *not* all of the hundreds of other defendants who participated in the mass crime at the U.S. Capitol.

Even if Chan were able to identify specific co-defendants or co-conspirators to compare his actions against, he still would not be able to meet his burden for a mitigating reduction. Whether to apply the reduction is "based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, app. n.3(C). A non-exhaustive list of factors to consider in making this determination include a defendant's knowledge about the scope and structure of the criminal activity, participation level in the criminal activity, level of decision-making authority, and the nature and circumstances of the defendant's actions. *Id.*, app. n.3(C). As discussed more fully below, Chan is not like some other rioters who unlawfully, but passively, entered the Capitol Building on January 6, stayed inside for only a brief time, and have since expressed sincere remorse for their conduct. Instead, Chan took affirmative steps to overwhelm the police protecting the Capitol and to assist others in doing so. More, Chan understood what he was doing at the Capitol on January 6 – as the Court noted in its verdict, "Mr. Chan admitted considering the repercussions of entering this door [to the Capitol.]" Verdict Tr. 6. But "despite taking this time to consider the circumstances, he entered the door and promptly photographed himself flipping off the security camera there." *Id.* Then, Chan did not leave the Capitol until he was forced to do so.

Chan was no minor or passive protestor in his unlawful entry and disruptive conduct; on the contrary, Chan repeatedly took aggressive steps to create an environment of chaos that would ultimately endanger police officers who were overwhelmed by the mob.

13

## V.       Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 10 months of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Chan's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Chan, the absence of violent acts is not a mitigating factor. Had Chan engaged in such conduct, he would have faced additional criminal charges.

As discussed above, one of the most important factors in Chan's case is how his destructive conduct contributed to other rioters' ability to flood the northwest staircase, which eventually led to several breaches into the building from the Upper West Terrace. During his lengthy stay on the northwest staircase banister, he not only cut away pieces of the inaugural stage protective tarping, but he assisted other rioters in lifting bike racks and a long pole up and over the ledge. When Chan ascended the northwest stairs, he stopped to help other rioters scale the external wall of the staircase.

14

Once inside the Capitol building, he made an obscene gesture at the CCTV camera; he initially testified that he did not think that anyone was watching the camera, but later conceded that the gesture was intended for the people behind the "orchestration" of the "inside job" that he believed January 6 to be. *See* Trial Tr. 163. Chan ultimately spent roughly a half hour inside the building -- he did not leave until he was forced out by police, and he did not leave the Capitol grounds for several hours.

Although this Court found Chan to be a generally credible witness, the Court did find that "[t]here were points" when "he was evasive and less than candid in his answers." Verdict Tr. 4. Regardless of his candor, Chan's statement to the FBI as well as his testimony are completely void of any remorse for the events of January 6. Accordingly, the nature and the circumstances of this offense establish the need for a significant sentence of incarceration in this matter.

### B. Chan's History and Characteristics

Chan has no criminal history. PSR ¶ 44. Chan earned his high school diploma in New Jersey and has completed some college coursework. PSR ¶ 62; *see also* Trial Tr. 167 (discussing architecture major). Since 2011, Chan has been sporadically employed in the food and hospitality industry. *See* PSR ¶¶ 65-72. He is currently unemployed. *See* PSR ¶¶ 63-64.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the

presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Here, the Court should consider the fact that Chan appears to have no remorse for his conduct. At trial, Chan continued to deflect responsibility for his actions and embrace conspiracy theories, characterizing what happened on January 6 as an "inside job" intended to entrap the rioters. Chan also expressed frustration with the non-lethal crowd control measures deployed by police and found these measures "unjustified." Such a characterization displays either a callous

disregard for or a willful ignorance of the violence faced by police officers serving at the Capitol on January 6. Though Chan testified that he recognized that the rally on January 6 was different from other pro-Trump rallies he had attended, his exposure and contributions to the violence of that day did not appear to faze him. He did not leave the Capitol building itself until he was forced out, and he did not leave Capitol grounds until the mayor's curfew was approaching. Specific deterrence is appropriate where, as here, the defendant has not shown any recognition of the wrongfulness of his actions, or even the actions of more culpable rioters around him.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Chan based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Alford*, No. 1:21-cr-263-TSC, a jury convicted the defendant of four misdemeanor offenses: 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). *See* Verdict Form, *Alford*, No. 1:21-cr-263-TSC, ECF No. 94. Alford had repeatedly walked past and ignored signs that the Capitol building and grounds were restricted, entered the Capitol through a door other rioters had broken into, refused to leave the Capitol until police ordered him and others to exit, celebrated his participation on social media, spread disinformation about the riot on social media, and was less than honest during his trial testimony. The Court sentenced him to twelve months imprisonment on the 18 U.S.C. §§ 1752 convictions and six months imprisonment on the 40 U.S.C. §§ 5104 convictions, all to run concurrently. *See* Judgment, *Alford*, No. 1:21-cr-263-TSC, ECF No. 110.

In *United States v. Rivera*, No. 1:21-cr-0060-CKK, the defendant was convicted of four misdemeanor offenses after a bench trial. *See* Findings of Fact and Conclusions of Law, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 62. Rivera livestreamed his presence in the Capitol and "urged his followers watching his Facebook livestream to share his livestream with their friends and followers" and proclaimed he was "about to take [his] ass to the middle of the [United] State[s] Capitol." *See* Sentencing Memorandum, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 69 at 5. Rivera announced to his followers that MPD officers were firing pepper spray at the rioters. *Id*., at 7. Rivera saw rioters climbing a wall and shouted at them, "there's an easier way up!" *Id.* Rivera

engaged in no violence in the Capitol, and left after approximately 20 minutes. Rivera was convicted of the same four charges of which Chan was charged (though Chan was acquitted of Count 3). The Court sentenced Rivera to eight months in prison. *Rivera*, No. 1:21-cr-0060-CKK, ECF. 82.

In *United States v. Simon*, 1:21-cr-000-cr-00346 (BAH), the defendant pled guilty to a single count of violating 18 U.S.C. 1752(a)(2). On the Lower West Terrace, Simon briefly joined other rioters in pushing a bicycle rack into a line of officers. Once inside the Capitol, Simon made his way to the Crypt and to the Rotunda, where he yelled and chanted in the direction of the police and recorded video of the mob's engagements with the police. The Court imposed a sentence of 8 months of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Chan to pay $500 in restitution for his convictions on Counts 1, 2, and 4. This amount fairly reflects Chan's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 10 months of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Katherine E. Boyles
Katherine Boyles
Assistant United States Attorney
D. Conn. Fed. Bar No. PHV20325
Katherine.Boyles@usdoj.gov
Phone: 203-931-5088

Matthew Moeder
Assistant United States Attorney
Mo. Bar. No. 64036
Matthew.Moeder@usdoj.gov

United States Attorney's Office
601 D Street NW
Washington, D.C. 20001